LODGED

ORIGINAL

11/82

**CRIMINAL COMPLAINT**

UNITED STATES DISTRICT COURT 2011 MAR 29 PM 2: 11   CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA
CLERK U.S. DISTRICT COURT
v.                                    CENTRAL D.    CALIF.
                                      RIVE

ODELL CHASE, aka "Fatty,"
TRACY BELL, aka "Monk,"

DOCKET NO.

ED11 - 0110M

MAGISTRATE'S CASE NO.

FILED
CLERK, U.S. DISTRICT COURT

MAR 29 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                            DEPUTY

UNDER SEAL

AO 91
Rev. 11/82

ORIGINAL

## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA | |
|---|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>ODELL CHASE, aka "Dell,"<br>TRACY BELL, aka "Monk," | DOCKET NO.<br><br>2011 MAR 29 PM 2: 1<br>CLERK U.S. DISTRICT COURT<br>CENTRAL DIST. OF CALIF.<br>RIVERSIDE<br>BY<br><br>MAGISTRATE'S CASE NO. | FILED<br>CLERK, U.S. DISTRICT COURT<br><br>MAR 2 9 2011<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY            DEPUTY |

ED 11-0110M

Complaint for violations of Title 21, United States Code, Sections 841(a)(1), and 841(b)(1)(B)(iii)
Complaint for violations of Title 21, United States Code, Sections 841(a)(1), and 841(b)(1)(C)

| NAME OF MAGISTRATE JUDGE<br>Honorable David T. Bristow | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Riverside, CA |
|---|---|---|
| DATES OF OFFENSES<br><br>February 8, 2011<br>February 11, 2011<br>February 18, 2011<br>March 11, 2011<br>March 15, 2011 | PLACES OF OFFENSES<br><br>San Bernardino County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

See Attachment.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>Scott M. Bowman |
|---|---|
| | OFFICIAL TITLE<br>Special Agent - Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br><br>March 29, 2011 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54

AUSA Fred W. Slaughter    REC: Detention
FWS

# A T T A C H M E N T

**COUNT ONE:** 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C)

On or about February 8, 2011, in San Bernardino County, within the Central District of California, defendant ODELL CHASE, also known as "Fatty," knowingly and intentionally distributed a mixture or substance containing a detectable amount of cocaine base in the form of crack cocaine, a schedule II narcotic drug controlled substance.

**COUNT TWO:** 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii)

On or about February 11, 2011, in San Bernardino County, within the Central District of California, defendant ODELL CHASE, also known as "Fatty," knowingly and intentionally distributed at least 28 grams, that is, approximately 39.5 grams, of a mixture or substance containing a detectable amount of cocaine base in the form of crack cocaine, a schedule II narcotic drug controlled substance.

**COUNT THREE:** 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii)

On or about February 18, 2011, in San Bernardino County, within the Central District of California, defendant ODELL CHASE, also known as "Fatty," knowingly and intentionally distributed at least 28 grams, that is, approximately 49.7 grams, of a mixture or substance containing a detectable amount of cocaine base in the form of crack cocaine, a schedule II narcotic drug controlled substance.

**COUNT FOUR:** 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C)

On or about March 11, 2011, in San Bernardino County, within the Central District of California, defendant TRACY BELL, also known as "Monk," knowingly and intentionally distributed a mixture or substance containing a detectable amount of cocaine base in the form of crack cocaine, a schedule II narcotic drug controlled substance.

**COUNT FIVE:** 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C)

On or about March 15, 2011, in San Bernardino County, within the Central District of California, defendant TRACY BELL, also known as "Monk," knowingly and intentionally distributed a mixture or substance containing a detectable amount of cocaine base in the form of crack cocaine, a schedule II narcotic drug controlled substance.

# A F F I D A V I T

## INTRODUCTION

I, Scott M. Bowman, being duly sworn, declare and state as follows:

1.   I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7).  As such, I am empowered by law to conduct investigations and make arrests for offenses enumerated in Title 18, United States Code, Section 2516.  I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), assigned to the Los Angeles Division, Riverside Resident Agency.  I have been employed as an FBI SA since 2005.

2.   In the course of my employment with the FBI, I have participated in a variety of violent crime investigations, including bank robbery, kidnaping, and murder.  I also have participated in investigations into criminal street gangs for criminal violations, including murder, attempted murder, extortion, assault with a deadly weapon, as well as the unlawful importation, possession with intent to distribute, and distribution of controlled substances.

3.   I have participated in numerous aspects of criminal street gang investigations, including the interception of wire communications, physical surveillance, utilization of confidential informants, consensually monitored telephone

1

conversations, the execution of search warrants, and the arrest of criminal street gang members. I have spoken with defendants, confidential informants, and witnesses who have extensive knowledge of the inner workings of criminal street gangs. I have also spoken with experienced gang and narcotics investigators concerning the methods and practices of criminal street gang members who are engaged in murder, attempted murder, extortion, assault with a deadly weapon, and narcotics trafficking.

4.   In addition, through my investigations, my training and experience, and my discussions with other law enforcement personnel, I have become familiar with the tactics and methods used by controlled substance traffickers to smuggle and safeguard controlled substances, to distribute controlled substances, to collect and launder the proceeds from the sale of controlled substances, and the clandestine manufacturing of narcotics. These tactics and methods include using cellular telephones, using cloned communication devices, using digital display paging devices, using debit calling cards, using public pay telephones, using counter-surveillance techniques, using false or fictitious identities, and using coded communications and coded words in conversations.

5.   I am currently assigned to the Riverside Resident Agency Gang Impact Team (hereinafter "GIT"). This task force consists of experienced SAs and gang and narcotics investigators

from the FBI, San Bernardino County Sheriff's Department
("SBCSD"), San Bernardino Police Department ("SBPD"), and
California Department of Corrections and Rehabilitation ("CDCR").
I have also spoken with experienced officers from the San
Bernardino Narcotics Unit and Gang Unit.

6. This affidavit is made in support of a criminal
complaint and arrest warrants for the following individuals:

a. ODELL CHASE ("CHASE"), also known as "Fatty," for
violations of Title 21, United States Code, Sections 841(a)(1),
and 841(b)(1)(B)(iii), distribution of at least 28 grams of a
mixture or substance containing cocaine base in the crack cocaine
("crack cocaine"), and a violation of Title 21, United States
Code, Sections 841(a)(1) and 841(b)(1)(C), distribution of crack
cocaine.

b. TRACY BELL ("BELL"), aka "Monk," for violations of
Title 21, United States Code, Sections 841(a)(1) and
841(b)(1)(C), distribution of crack cocaine.

7. This affidavit is also submitted in support of an
application for warrants authorizing searches of the premises
listed in Attachment A of this affidavit, which is incorporated
herein by reference, and the seizure of evidence, contraband,
fruits, and instrumentalities of violations of Title 21, United
States Code, Sections 846 and 841(a)(1), conspiracy to distribute
controlled substances including crack cocaine, and Title 21,

3

United States Code, Section 841(a)(1), distribution of controlled substances including crack cocaine, more fully described in Attachment B of this affidavit, which is incorporated herein by this reference.

8.    This affidavit is intended to show that there is sufficient probable cause for the requested arrest warrants and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  The statements set forth in this affidavit are based upon my training, education and experience, consultation with experienced law enforcement officers and agents, and other reliable sources of information relative to this investigation.  This affidavit is based on a joint investigation by members of the FBI - San Bernardino Gang Impact Team ("GIT").

PREMISES TO BE SEARCHED

9.    The premises to be searched for evidence of violations of Title 21, United States Code, Sections 846 and 841(a)(1), conspiracy to distribute controlled substances including crack cocaine, and Title 21, United States Code, Section 841(a)(1), distribution of controlled substances including crack cocaine, are described in Attachment A as follows:

SUBJECT PREMISES 1

a.    The premises described as 7414 Elm Street, Apartment #4, San Bernardino, California ("SUBJECT PREMISES 1").

4

SUBJECT PREMISES 1 is located in a multiple family, two-story apartment complex, with tan stucco encompassing the exterior with brown wood trim and a brown composite shingle roof, located on the west side of Elm Street.  The complex houses four apartments and sits mid-block on Elm Street south of Baseline Avenue.  The number 7414 is affixed in brown painted numerals on the east side of the building.  SUBJECT PREMISES 1 is located on the second floor and is accessed by stairs with brown wrought iron railing attached to the north side of the building.  The door to SUBJECT PREMISES 1 faces north and is located in the northwest corner on the second level.  The door is gold in color and is shielded by a brown security screen with a black number 4, approximately four inches tall, affixed to it.  On the west end of the complex separated by a concrete walkway is a carport which is accessed by an alley with two exits onto Elm Street.  The carport has the number 7414 on wood trim on the outside facing the alley.  Within the carport are raised wooden storage bins where are beige in color.  The areas to be searched include the residence on SUBJECT PREMISES 1 and all rooms, porches, locked containers, safes, and other parts therein; outbuildings associated with SUBJECT PREMISES 1, including the carport for SUBJECT PREMISES 1 and storage bins and storage lockers for SUBJECT PREMISES 1 located within the carport; all trash containers and any other type of container located upon and within the boundaries of SUBJECT

PREMISES 1; and all areas within the boundaries of the property of SUBJECT PREMISES 1, including gardens, lawns, and the ground.

### SUBJECT PREMISES 2

b.   The premises described as 1471 N. Wall Avenue, San Bernardino, California ("SUBJECT PREMISES 2").  SUBJECT PREMISES 2 is a multi-family, single story residence, with grey stucco encompassing the exterior with white wood trim and a grey composite shingle roof, located on the east side of N. Wall Avenue facing west between 15th Street to the north and 14th Street to the south, in San Bernardino, California.  The front door faces west and is shielded by a white metal security door. The driveway is located on the north end of the residence and runs east west.  The garage is white in color and faces north. The number 1471 is displayed in black numbers on a white porch covering leading to the front door.  A four foot tall chain link fence surrounds the residence.  The areas to be searched include the residence on SUBJECT PREMISES 2 and all rooms, porches, locked containers, safes, and other parts therein; all outbuildings upon SUBJECT PREMISES 2, including the storage shed, any other storage sheds, storage room(s) or storage locker(s) thereupon; all vehicles located upon the physical property of SUBJECT PREMISES 2; all trash containers and any other type of container located upon and within the boundaries of SUBJECT PREMISES 2; and all areas within the boundaries of the property

of SUBJECT PREMISES 2, including gardens, lawns, and the ground.

SUBJECT PREMISES 3

d.   The premises described as 1414 N. Riverside
Avenue, Apartment 124, Rialto, California ("SUBJECT PREMISES 3").
SUBJECT PREMISES 3 is a multi-family, ninety-eight unit, two
story apartment complex located on the west side of Riverside
Avenue between Baseline Avenue to the south and Cascade Avenue to
the North.   At the entrance to the complex affixed to a beige
concrete wall are the numbers 1414 in brown.   The units have
beige stucco encompassing the exterior with white trim and grey
tile roofs, each of the units is numbered with a large white
number on the upper level.   SUBJECT PREMISES 3 is located in
building number 5 and is accessed by entering the security gate
off of Riverside Avenue and is the first apartment on the west
side of the property.   The apartment is located on the first
floor of building number 5 and the door is burgundy in color.
The door faces south and the numbers 124 are affixed to it on a
burgundy placard with white numbers.   The balcony to SUBJECT
PREMISES 3 faces north and is surrounded by a four foot beige
stucco wall.   The areas to be searched include the residence on
SUBJECT PREMISES 3 and all rooms, porches, locked containers,
safes, and other parts therein; all outbuildings upon SUBJECT
PREMISES 3, including the storage shed, any other storage sheds,
storage room(s) or storage locker(s) thereupon; all trash

containers and any other type of container located upon and within the boundaries of SUBJECT PREMISES 3; and all areas within the boundaries of the property of SUBJECT PREMISES 3, including gardens, lawns, and the ground.

### SUBJECT VEHICLE 1

e. The premises described as a 2000 Gold Cadillac Escalade, bearing California license plate 3WLP250, bearing Vehicle Identification Number 1GYEK63R2YR194268 ("SUBJECT VEHICLE 1"), registered to Ray Vasquez, 16379 Ceres Avenue, Fontana, California, 92335.

### ITEMS TO BE SEIZED

10. The items to be seized as evidence of violations of Title 21, United States Code, Sections 846 and 841(a)(1), conspiracy to distribute controlled substances including crack cocaine, and Title 21, United States Code, Section 841(a)(1), distribution of controlled substances including crack cocaine from SUBJECT PREMISES 1, SUBJECT PREMISES 2, and SUBJECT PREMISES 3, and SUBJECT VEHICLE 1, are described in Attachment B and incorporated by reference herein.

### THE CONFIDENTIAL INFORMANT

11. An FBI Confidential Informant (the "CI") was used during the course of this investigation. The CI has provided the FBI with reliable information in the past regarding various criminal activities, including the unlawful sale of firearms and

controlled substances, and said information has been proven credible through independent corroboration. The CI has participated in several undercover operations. Under the guidance and control of FBI SAs and Task Force Officers, the CI has purchased evidence (controlled narcotic substances) in furtherance of this investigation. Through my direct involvement in this investigation, I know that beginning in January 2011, the CI began providing information to myself and other investigators involved in the investigation about the narcotics sales of members and associates of criminal street gang members in San Bernardino, including CHASE and BELL, as described below.

12. The CI is a Mexican citizen and is an associate of Cali-Style/Hood League Records, a Redlands, California rap music label. The CI has lived a majority of his/her life in Highland, California and has an extensive knowledge of the record company, and has formed a personal relationship with aspiring recording artists and area criminal street gang members including BELL and CHASE.

13. My initial interview of the CI took place in July 2009, while he/she was incarcerated at the West Valley Detention Center in Rancho Cucamonga, California for a violation of California State Penal Code Section 415, disturbing the peace, for which the CI served thirty days of jail. During the interview, the CI identified to law enforcement officials the identity and cocaine

9

trafficking methods of a Rollin 30's Harlem Crip criminal street
gang member, cocaine distributor, and recording artist for
Cali-Style/Hood League Records.

14.  At the conclusion of the initial interview, the CI
agreed to provide additional information and work as an FBI human
source in exchange for money, and in hopes of securing legal
citizenship status in the United States.  As a result of the CI's
cooperation, the CI received a Significant Public Benefit Parole
on September 15, 2009 (and again on January 14, 2011), from the
U.S. Immigration and Customs Enforcement, which allows the CI
legal status within the United States and the ability to apply
for authorization to seek legal employment within the United
States.  While utilizing the CI, I periodically conducted law
enforcement records checks.  On March 21, 2011, I again reviewed
a copy of the CI's arrest history and learned the following:

a.  In 1998 and 1999 the CI was arrested for being in
violation of California Health and Safety Code Section 11359,
possession of marijuana for sale.

b.  In 2000 the CI was deported by U.S. Immigration
and Customs.

c.  In 2002 the CI was arrested and convicted for
being in violation of California Health and Safety Code section
11359, possession of marijuana for sale, and sentenced to two (2)
years state prison.  The CI told Task Force Officer ("TFO") Marco

Granado and me that at the time of the CI's arrest, the CI was
working as a confidential informant for the SBPD and was arrested
by his/her handling officer.  I spoke with SBPD Sergeant Gary
Schuelke, the CI's handling officer on July 6, 2010, about the
CI.  Sergeant Schuelke told me he worked with the CI for
approximately six months during late 2000 or 2001.  During the
period, the CI produced numerous buy bust arrests, gun, and drug
seizures and was considered very productive and reliable by
Sergeant Schuelke.  During the period, the SBPD with the
assistance of the CI began an investigation into a Mexican
marijuana trafficker who transported large amounts of marijuana
into San Bernardino.  According to Sergeant Schuelke, the CI was
responsible for seizures of several hundred pounds of marijuana
at several San Bernardino area stash houses.  However, on one
occasion, the CI offered the marijuana trafficker the use of the
CI's residence as a stash location without disclosing the
information to Sergeant Schuelke.  After learning of the
information, Sergeant Schuelke arrested the CI and seized a large
shipment of marijuana.  The CI later explained the CI was trying
to gain the trust of the marijuana trafficker, however, Sergeant
Schuelke believed the CI was attempting to make money without
disclosing the fact to the SBPD.

      d.    In 2009, the CI was arrested for being in
violation of California Health and Safety Code section 11350,

under the influence of a controlled substance.  This case was later dismissed.

       e.    In 2009 the CI was arrested for being in violation of California Penal Code section 415(2), disturbing the peace, which the CI was sentenced to thirty days of jail.

       f.    In 2010, the CI was cited, but not arrested, for being in violation of California Health and Safety Code section 11350, under the influence of a controlled substance.  This case was later dismissed.

    15.    During the period on which the CI has provided information to the FBI, the CI has provided reliable information which has been corroborated through physical evidence, surveillance and other sources of information; however, on one occasion the CI was found to have committed an unauthorized purchase of cocaine from a subject of an FBI investigation which took place on or about October 23, 2009, in which the CI was "fronted" one-half ounce of cocaine that the CI sold to an acquaintance for $450.00.  I learned about the CI's involvement in the unauthorized narcotics transaction on or about October 25, 2009.  On October 25, 2009, TFO Granado and I met with the CI for the purpose of attempting to conduct a controlled purchase of one-half kilogram of cocaine, plus an additional one-half ounce of cocaine from a subject of an FBI investigation.  Prior to the controlled purchase, I provided the CI with $13,500 in U.S.

12

currency for the narcotics transaction.  The CI, upon from returning from the subject's residence told me that the CI was unsuccessful in purchasing the narcotics.  In addition, the CI returned $13,100 to me and admitted having to pay the subject, $400 for one-half ounce of cocaine the subject "fronted" the CI two days earlier.  The CI was admonished for conducting unauthorized illegal activity by me and re-paid me $400.00 on or about October 27, 2009.

SUMMARY OF INVESTIGATION

        16.  In January 2011, FBI - GIT agents and officers began a criminal investigation into the unlawful trafficking of controlled substances by San Bernardino area gang members including BELL and CHASE.  BELL, who was known to the CI as "Monk," and CHASE, known to the CI as "Fatty," were identified by the CI as narcotics distributors during the course of this investigation.  During the investigation, at FBI - GIT direction and FBI - GIT supervision, the CI purchased crack cocaine from CHASE on multiple occasions, and the CI purchased crack cocaine from BELL on multiple occasions.  Based on my investigation and conversations with the CI, SBPD officers and SBCSD deputies, as well as my own observations, I believe that both BELL and CHASE, as described below, are admitted members criminal street gangs, BELL, a Mona Park Crip and, CHASE, a Park Village Crip.  Based on my training and experience, I know criminal street gang members

13

are often engaged in the unlawful distribution of unlawful
substances including crack cocaine.  Furthermore, I am aware that
Los Angeles based criminal street gang members are active within
San Bernardino county.

STATEMENT OF PROBABLE CAUSE

19.  Based on my personal investigation in this case, my
conversations with other law enforcement officials involved in
the investigation, debriefing the CI, review of electronic
surveillance, and reading law enforcement reports, I learned the
following:

January 2011

a.  Beginning in early January 2011, the CI informed me
that an individual, who used the moniker of "Monk," later
identified through my investigation as BELL, was involved in the
distribution and trafficking of crack cocaine from SUBJECT
PREMISES 2.  The CI had been introduced to BELL during November
2010 by an individual who purchased crack cocaine on a regular
basis from BELL.  After meeting BELL, the CI became friendly with
BELL and often stopped in the neighborhood to talk to BELL.  BELL
also gave the CI his telephone number, (909) 561-9939 ("BELL's
phone number").  While in the vicinity of SUBJECT PREMISES 2, the
CI observed BELL sell crack cocaine to a wide variety of
customers including an individual who used the moniker of
"Fatty," later identified through my investigation as CHASE.

14

During one of these visits, CHASE told the CI to call him if the
CI ever needed anything because "I got my own people too." After
several visits to SUBJECT PREMISES 2 where the CI also observed
CHASE, the CI became friendly with CHASE, and CHASE gave the CI
his cellular telephone number, that is, (909) 994-4948 ("CHASE's
phone number").

        b.   According to the CI, SUBJECT PREMISES 2 was a
duplex that was "open for business" during daylight and night
time hours, which meant to me, based on my training and
experience, that SUBJECT PREMISES 2 was a location where you
could buy drugs at all times of the day. According to the CI,
SUBJECT PREMISES 2 was controlled by BELL who sold "quarter
pieces" (7 grams) and "half ounce" (14 gram) quantities of crack
cocaine to neighborhood customers. The CI also observed other
unknown individuals at the residence who the CI described as
lookouts and associates of BELL.

    20.   On January 21, 2011, TFO John Plummer told me he knew
an individual who used the moniker of "Monk," and that "Monk" was
BELL. TFO Plummer had previously encountered BELL while TFO
Plummer was a patrol officer with the SBPD. Based on that
information, I conducted a driver's license inquiry with the
California Department of Motor Vehicles ("DMV") and obtained a
photograph of BELL. On the same date, I showed a photograph of
BELL with no identifying information to the CI. The CI told me,

15

"that's Monk."

21.   On January 21, 2011, subsequent to the CI's
identification of BELL, the CI directed TFO Plummer and me to
SUBJECT PREMISES 2 where the CI had previously observed BELL sell
crack cocaine.  The CI did not believe BELL lived at SUBJECT
PREMISES 2, but believed that BELL had a girlfriend who resided
in a green house on 16th Street and Genevieve Avenue in San
Bernardino.  During a drive by of SUBJECT PREMISES 2, TFO Plummer
and I observed BELL, who was wearing a red hat, white T-shirt,
and red shorts walking from a residence on 16th Street to a blue
Pontiac sedan, bearing California license plate number 4GZK428
(the "blue Pontiac").[1]

<u>Distribution of Crack Cocaine to the CI by CHASE</u>

22.   Based on my personal investigation in this case,
including my conversations with other law enforcement officials
involved in the investigation, debriefing the CI, review of
electronic surveillance, and reading law enforcement reports, I
learned the following:

a.   On February 8, 2011, February 11, 2011 and
February 18, 2011, the CI participated in controlled
investigative narcotics purchases from CHASE at my direction and
control.  Additionally, on March 11, 2011 and March 15, 2011, the

---

[1]     I later conducted an inquiry on blue Pontiac and
learned that it was registered to BELL at 474 E. Wabash Avenue,
Apt 64, San Bernardino, California.

CI participated in controlled investigative narcotics purchases from BELL at my direction and control (these transactions are further described below).

b.    Unless otherwise noted, prior to each of the transactions described below, the CI's person was searched and found to be free from possessing any illegal controlled substances, weapons, drug paraphernalia, contraband, and unaccounted for money.  Furthermore, the CI's person was searched after the CI's contact with CHASE and BELL and on each occasion, the CI was found to be free from possessing any illegal controlled substances (except for the suspected crack cocaine purchased by the CI from the respective individual during the controlled investigative narcotics transactions), weapons, drug paraphernalia, contraband, and unaccounted for money.

c.    Prior to each of the transactions described below, the CI was provided a specific amount of U.S. currency for the purpose of attempting to purchase crack cocaine from CHASE and BELL.

d.    Unless otherwise noted, while participating in each of the transactions described below, the CI was maintained under constant and/or intermittent visual observation by myself and/or other members of GIT before, during, and after the controlled investigative narcotics purchases were completed. During the course of this investigation, the CI had several

17

consensually recorded and monitored telephone conversations with CHASE and BELL.  I have reviewed the recorded telephone conversations which corroborated the information provided to us by the CI.  However, during this investigation, not all of the telephone conversations or contacts between the CI, CHASE, and BELL were monitored and/or recorded because of their associations outside of narcotics transactions.

e.   Unless otherwise noted, during each narcotics transaction described  herein, the CI was equipped with an electronic recording device (e.g. body wire) and a digital video recorder while the CI had contact with CHASE and BELL.  I have reviewed the recordings made from the electronic listening device utilized during this investigation and they corroborate the information provided to me by the CI in regards to the CI's contact with CHASE and BELL  I have also reviewed the digital video footage captured by the recorder worn by the CI during this investigation, and that the digital video footage, with audio, corroborates the information provided to me by the CI and/or surveillance units in regards to the CI's narcotics transactions with CHASE and BELL as described below.

f.   The suspected crack cocaine purchased during each of the transactions, as described below, was tested by me or other FBI - GIT members utilizing a NIK field test kit, which resulted in a positive test reading for the presence of cocaine,

18

a Schedule II controlled substance.   The suspected crack cocaine
purchased during this investigation by the CI was subsequently
submitted to the FBI Riverside Resident Agency for proper storage
and/or retention, until the time that the suspected crack cocaine
was sent to the Drug Enforcement Agency ("DEA") for qualitative
and quantitative analysis.

### February 8, 2011, Crack Cocaine Purchase from CHASE

g.   On February 8, 2011, the CI met with TFO Plummer
and me.   During the meeting, at approximately 12:30 p.m. I
directed the CI to make a call to CHASE on CHASE's phone number
to attempt to negotiate a one ounce purchase of crack cocaine.[2]
During the recorded call, which was overheard on speaker phone by
TFO Plummer and me, the CI asked, "How much is it on the price, a
ticket for a zip," which meant, based on my training and
experience, how much was the price of one ounce of crack cocaine.
CHASE responded 800.   The CI asked how long it would be.   CHASE
asked if the CI was ready then.   The CI responded that the CI was
ready.   CHASE said he would call the CI right back.   The call
ended.   At approximately 12:36 p.m., the CI received an incoming

---

[2]      Unless otherwise noted, calls made to CHASE were made
to CHASE's phone number.   On March 25, 2011, I reviewed
subscriber information for CHASE's phone number that had been
obtained via administrative subpoena.   The subscriber information
indicated that on February 8, 2011, CHASE's phone number was
subscribed to O Deal Chase, 2824 Long Point, Ontario, California
91761.   In addition, the CI had CHASE's telephone number on
February 8, 2011, based on the CI's prior contacts with him.   The
CI knew CHASE by the moniker of "Fatty."

19

call from CHASE's phone number.  During the recorded call that
was also overheard by TFO Plummer and me, CHASE said that it was
going to take an hour.  At approximately 1:34 p.m., at TFO
Plummer's and my direction, the CI placed a recorded call to
CHASE.  During the recorded call that was also overheard by TFO
Plummer and me, CHASE told the CI, "Give me 15 minutes and come
on through."  Based on my investigation and the CI's
understanding, TFO Plummer and I directed the CI to go to SUBJECT
PREMISES 1 for the attempted transaction.

      h.  At approximately 1:35 p.m., TFO Robert Arrieta and
TFO Jeff Faust established surveillance in the area of SUBJECT
PREMISES 1.  At approximately 1:50 p.m., the CI arrived in the
area of SUBJECT PREMISES 1 after being followed by TFO Plummer
and me.  The CI exited the CI's vehicle and walked toward SUBJECT
PREMISES 1.  At approximately 1:52 p.m., TFO Arrieta and TFO
Faust saw the CI walking away from the area of SUBJECT PREMISES 1
with CHASE.  The CI entered the driver's seat of the CI's vehicle
and CHASE entered the passenger's seat of the CI's vehicle.
Thereafter, the CI's vehicle departed from the area of SUBJECT
PREMISES 1 while being followed by surveillance units including
TFO Granado and TFO Bob Kelly.

      i.  At approximately 2:02 p.m., the CI's vehicle
parked near a residence located at 1001 N. Mountain View, San
Bernardino, California ("1001 N. Mountain View").  TFO Kelly saw

CHASE exit from the CI's vehicle and enter 1001 N. Mountain View without knocking. At about 2:05 p.m., CHASE exited 1001 N. Mountain View, and reentered the CI's vehicle which was followed back to SUBJECT PREMISES 1 by surveillance units including TFO Plummer and me. While following the CI's vehicle, TFO Plummer and I pulled directly alongside the CI's vehicle and observed CHASE as the passenger of the CI's vehicle.

   j. At about 2:13 p.m., the CI's vehicle arrived at SUBJECT PREMISES 1. CHASE exited the CI's vehicle and walked towards SUBJECT PREMISES 1 where he was then unobserved. At approximately 2:19 p.m., TFO Faust and TFO Arrieta observed CHASE walking back to the passenger side of the CI's vehicle and returning towards SUBJECT PREMISES 1 approximately thirty seconds later.

   k. At approximately 2:21 p.m, TFO Faust and TFO Arrieta observed CHASE walking back to the passenger side of the CI's vehicle and return towards SUBJECT PREMISES 1 shortly thereafter. The CI's vehicle then departed northbound on Elm Street followed by TFO Plummer and me to a neutral location. TFO Plummer and I were unable to see the the CI's vehicle for approximately two minutes when TFO Plummer and I were forced to stop at a traffic light.

   l. At approximately 2:26 p.m., TFO Plummer and I met with the CI who provided me with approximately 22 grams of

suspected crack cocaine.  The CI told me that when the CI arrived on Elm Street, the CI exited the CI's vehicle and walked upstairs to SUBJECT PREMISES 1.  CHASE was standing outside SUBJECT PREMISES 1 and asked the CI to take him to his "people's house." CI-1 then departed from SUBJECT PREMISES 1 with CHASE and proceeded to a house on Mountain View, that is, 1001 N. Mountain View.  CHASE exited the CI's vehicle and walked inside 1001 N. Mountain View.  Shortly thereafter, CHASE came back to the CI's vehicle.  CHASE told the CI that the individual within the house had his girl deliver the crack cocaine to CHASE's residence, that is, SUBJECT PREMISES 1, so they needed to return there to complete the deal.  When the CI-1 arrived back at SUBJECT PREMISES 1, CHASE exited the CI's vehicle and walked upstairs to retrieve the crack cocaine.  When CHASE returned, the CI provided CHASE with $800 in exchange for a plastic bag containing suspected crack cocaine.  The CI then asked CHASE if the CI could get some more for himself/herself.  CHASE then went back upstairs to the apartment, that is, SUBJECT PREMISES 1, and returned with a small bag of suspected crack cocaine which he gave to the CI in exchange for $100.

m.   On February 8, 2011, at the conclusion of the narcotics transaction between CHASE and the CI, I learned from TFO Plummer that CHASE was contacted on November 4, 2010, at SUBJECT PREMISES 1 by SPBD Officer Jason Heiman who identified

CHASE as a Park Village Crip.[3]   I conducted a driver's license
inquiry with the DMV and obtained a photograph of CHASE.   TFO
Plummer and I reviewed a California driver's license photograph
of CHASE and identified him as the same individual who was
observed inside the CI's vehicle on February 8, 2011.

<u>February 11, 2011, Crack Cocaine Purchase from CHASE</u>

n.   On February 11, 2011, the CI met with me.   During
the meeting, I showed the CI a photograph of CHASE without
identifying information and the CI told me the individual in the
photograph was the person known to the CI as "Fatty" or "Ladell."
I then directed the CI to make a call to CHASE to attempt to
negotiate a one or two ounce purchase of cocaine.   During the
recorded call, which was overheard on speaker phone by me and TFO
Plummer, the CI asked, "Hey can we do the same thing?"   CHASE
replied, "Yeah, I'm at the house, I don't want to talk on the
phone, I'm at the house."

o.   At 11:25 a.m., I provided the CI with a digital
scale to use during the transaction because the last purchase
from CHASE was about 7 grams less than agreed upon.   At 11:29
p.m., the CI received an incoming call from CHASE's phone number
that was overheard by me.   During the call, CHASE asked the CI if

---

[3]      On March 25, 2011, I also spoke with Officer Heiman who
informed me that during his contact with CHASE on November 4,
2010, CHASE self-admitted to being a member of the Park Village
Crips.

the CI was coming and the CI said that the CI was on his/her way. At approximately 11:30 a.m., TFO Jason Rosenbaum established surveillance in the area of SUBJECT PREMISES 1. At 11:32 a.m., the CI departed from a neutral location while being followed by FBI SA Andrew Sharp and me. At approximately 11:38 a.m., TFO Rosenbaum observed the CI arrive at SUBJECT PREMISES 1 and walk toward the SUBJECT PREMISES 1, turn around, retrieve something from the CI's vehicle (the digital scale) and walk towards SUBJECT PREMISES 1 where the CI was then unobserved. At about 11:42 a.m., the CI reentered the driver's seat of the CI's vehicle and departed from the SUBJECT PREMISES 1 northbound on Elm Street followed by SA Sharp and me.

p. At approximately 11:50 a.m., SA Sharp and I met with the CI at a neutral location. The CI provided me with approximately 14 grams of suspected crack cocaine, which was approximately 14 grams less than the agreed upon amount of one ounce. The CI told me when the CI arrived on Elm Street, the CI exited his/her vehicle and walked upstairs to CHASE's apartment, that is, SUBJECT PREMISES 1. The CI asked CHASE for one and a half ounces of crack cocaine, however, CHASE told the CI he only had an ounce. CHASE then left the apartment walked down the stairs and was unobserved by the CI. When CHASE returned he provided the CI a plastic bag of suspected crack cocaine in exchange for $800. The CI attempted to weigh the cocaine on a

24

digital scale provided by me, but was unable to turn the digital scale on.

q.   Subsequently, I changed the batteries on the digital scale and weighed and photographed the amount of suspected crack cocaine purchased from CHASE.  Furthermore, based on the fact that the CI only received approximately 14 grams instead of the 28 grams (one ounce) of crack cocaine the CI paid for, I directed the CI to place a call to CHASE to resolve the issue.  At approximately 11:52 p.m., during a recorded call that was also overheard by me, the CI told CHASE that the CI had paid for a "full one and only got 14 grams."  CHASE asked the CI if he was sure.  The CI said he/she was sure and CHASE told the CI to come back to SUBJECT PREMISES 1.  Prior to the CI departing, I provided the CI with a functional digital scale and an additional $400 dollars.  The CI was instructed to retrieve the 14 grams of crack cocaine that was owed to the CI and attempt to purchase an additional half ounce (14 grams) of crack cocaine from CHASE.  I also provided the CI with the suspected crack cocaine previously purchased from CHASE so that CHASE would be able to weigh the amount on the digital scale I provided to the CI.  At approximately 12:11 p.m., the CI departed for SUBJECT PREMISES 1 while being followed by SA Sharp and me.

r.   At approximately 12:15 p.m., TFO Rosenbaum observed the CI arrive at SUBJECT PREMISES 1 and walk toward SUBJECT

PREMISES 1, where the CI was then unobserved.   At approximately
12:20 p.m., TFO Rosenbaum watched as the CI left from the area of
SUBJECT PREMISES 1 and drove away.   The CI drove to a neutral
location while being followed by SA Sharp and me.

     s.   At approximately 12:27 p.m., SA Sharp and I met
with the CI who provided me with approximately 25 grams of
suspected crack cocaine (approximately 3 grams short of the
purchased amount of one ounce).   The CI told me when he/she
arrived on Elm Street, the CI exited his/her vehicle and walked
upstairs to SUBJECT PREMISES 1.   The CI entered the kitchen with
CHASE and weighed the previously purchased suspected crack
cocaine.   CHASE then left the apartment and walked downstairs,
made a left, and walked to the alley behind the apartment
complex.[4]   Shortly thereafter, CHASE returned upstairs with crack
cocaine in his hand and placed it on the scale along with the
previously purchased cocaine.   The amount placed on the scale was
approximately 26 grams.   CHASE then told the CI he would have the
additional two grams in approximately 30 minutes.   The CI then
asked CHASE for an additional half ounce and CHASE agreed.   The
CI then departed SUBJECT PREMISES 1.

     t.   Subsequently, I weighed and photographed the
amount of suspected crack cocaine purchased from CHASE.

---

[4]   Based on my investigation and own observations, I know
that a carport for SUBJECT PREMISES 1 is accessible from the
alley behind SUBJECT PREMISES 1.

Furthermore, based on the fact that the CI only received approximately 25 grams instead of the 28 grams of (one ounce) crack cocaine the CI paid for, and because CHASE agreed to sell the CI an additional one half ounce of crack cocaine, at approximately 12:56 p.m., I directed the CI to call CHASE to inquire when to pick up the crack cocaine from SUBJECT PREMISES 1. During the recorded call, which was also overheard by me, CHASE told the CI, "Give me 15 to 20 more minutes and I'll hit you back." At approximately 1:03 p.m., the CI received an incoming recorded call that was also overheard by me. During the call, CHASE asked, "Do you still want that or what?" The CI said yes, and CHASE said, "Well you might as well come this way." Thereafter, at approximately 1:06 p.m., the CI received a call from CHASE asking where the CI was located. The CI stated that the CI was on his/her way. The CI then drove towards SUBJECT PREMISES 1 while being followed by SA Sharp and me.

u. At approximately 1:14 p.m., TFO Rosenbaum observed the CI arrive on Elm Street in the area of SUBJECT PREMISES 1 and park. Surveillance observed CHASE walking away from a parked white Ford Explorer, with paper plates (the "Ford Explorer") and walking to the driver's side window of the CI's vehicle where TFO Rosenbaum observed a hand-to-hand exchange between CHASE and the CI. The CI then departed from the area of SUBJECT PREMISES 1 northbound on Elm Street followed by TFO Sharp and me.

27

Additionally, CHASE was observed entering the passenger side of the Ford Explorer which departed northbound on Elm Street followed by TFO Faust and TFO Rosenbaum.

v. At approximately 1:21 p.m., SA Sharp and I met with the CI who provided me with suspected crack cocaine. The CI told me when the CI arrived on Elm Street, CHASE was standing outside waving at him next to the Ford Explorer. When the CI stopped, CHASE gave him the crack cocaine in exchange for $400.

w. Following the events described above on February 11, 2011, I weighed the suspected crack cocaine obtained by the CI from CHASE that day. The suspected crack cocaine weighed approximately 42 grams including the plastic bag packaging. I also reviewed the recorded transactions which corroborated the information the CI provided me during the debrief.

x. On February 11, 2011, at approximately 1:15 p.m., after CHASE conducted a hand-to-hand exchange with the CI on Elm Street, TFO Faust and TFO Rosenbaum followed CHASE, a passenger in the Ford Explorer, to the DMV located on 13th and Wall Avenue in San Bernardino. TFO Faust then requested a SBPD unit to attempt to identify the occupants of the Ford Explorer.

y. At approximately 1:20 p.m., SBPD Officer Jesse Joyce pulled next to the Ford Explorer and identified the CHASE and his wife who were standing outside the vehicle. More specifically, Officer Joyce approached and asked if he could talk

28

CHASE and the female with him.   CHASE and the female agreed.
Officer Joyce completed field interview cards of CHASE who
identified himself as CHASE, and gave an address of 7414 Elm
Street, Apartment #4, that is, SUBJECT PREMISES 1, and his spouse
Jonae Chase.   CHASE and his wife indicated that they were at the
DMV regarding a vehicle purchase.   After briefly talking with
CHASE and his wife, Officer Joyce departed from the area.

       February 17, 2011

          z.   On February 17, 2011, I met with the CI and
directed the CI to call CHASE to attempt to purchase crack
cocaine.   At 12:15 p.m., and 12:25 p.m, the CI called CHASE's
phone number, but both times the calls went to voicemail and no
messages were left by the CI.

       February 18, 2011 Crack Cocaine Purchase from CHASE

          aa.   On February 18, 2011, the CI met with TFO Plummer
and me.   During the meeting, at approximately 11:38 a.m., I
directed the CI to make a call to CHASE to attempt to negotiate a
two ounce purchase of cocaine.   During the recorded call, that
was also overheard by TFO Plummer and me, the CI said, "Are you
gonna be at the keyzou (house) because I need two dog and I need
to talk to you."   CHASE told the CI, "Yeah I'll be here."   Later,
at approximately 11:40 a.m., I directed the CI to call CHASE.
During the recorded call, that I was also able to overhear, the
CI told CHASE that it would take the CI about 30 minutes and the

                                29

CI asked if CHASE needed more time.  CHASE responded, "That's
cool, you can wait longer."

        bb.  At approximately 12:30 p.m, the CI was provided
with $1,600 and a digital scale.  At about 12:50 p.m., the CI
left from the neutral location while being followed by TFO
Plummer and me.  At approximately 12:56 p.m., SA Sharp observed
the CI arrive in the area of SUBJECT PREMISES 1 and walk toward
SUBJECT PREMISES 1.  At about 1:10 p.m, SA Sharp observed the CI
walking back to the CI's vehicle, where the CI retrieved
something from the CI's vehicle (a digital scale) and walked
towards SUBJECT PREMISES 1 where the CI was then unobserved.  At
approximately 1:14 p.m., the CI left from SUBJECT PREMISES 1 and
drove away while being followed by TFO Plummer and me.  At
approximately 1:16 p.m, the CI called me and told me that CHASE
had sold him one ounce of crack cocaine and that CHASE would have
the other ounce in approximately 30 minutes.

        cc.  At approximately 1:23 p.m., TFO Plummer and I met
with the CI at a neutral location.  The CI provided me with
several clear plastic bags of suspected crack cocaine.  The CI
told me the CI exited his/her vehicle and walked upstairs to
SUBJECT PREMISES 1.  CHASE's son opened the door and let the CI
in because CHASE was asleep.  CHASE woke up, greeted the CI, and
walked out of the residence down the stairs and to the alley

30

behind the apartment complex.[5]   After approximately five minutes,
CHASE returned and directed the CI into the kitchen where he
showed the CI the crack cocaine which CHASE believed was
approximately one ounce.   The CI then departed from SUBJECT
PREMISES 1, entered the CI's vehicle, retrieved a digital scale
and then quickly returned to the residence.   Once back in the
residence, CHASE weighed the suspected cocaine which weighed
approximately 24.7 grams.   CHASE told the CI he would get the
rest (one ounce plus an additional few grams) in approximately 30
minutes.   The CI provided CHASE with $800 and told CHASE he/she
would return in approximately 30 minutes.   The CI departed from
SUBJECT PREMISES 1.

> dd.   At approximately 1:31 p.m., the CI received an
incoming recorded call from CHASE (the CI mistakenly did not
place the phone on speaker phone and therefore, only the CI's
voice was recorded).   During the call, I overheard the CI say,
"ok, where do you want me to meet you at, ok, I'll be over
there."   After the call, the CI told me that CHASE told the CI
that CHASE had the crack cocaine the CI wished to purchase and
told the CI to meet him at SUBJECT PREMISES 1.   Based on the fact
that CHASE had an additional ounce of crack cocaine to sell the
CI, I directed the CI back to SUBJECT PREMISES 1.   At about 1:35

---

[5]      As stated above, based on my investigation and own
observations, I know that a carport for SUBJECT PREMISES 1 is
accessible from the alley behind SUBJECT PREMISES 1.

p.m., I provided the CI with $800, a digital scale, and directed the CI to attempt to obtain an additional ounce of crack cocaine and the three grams of crack cocaine that were missing.

ee.  At 1:42 p.m., the CI received a recorded call from CHASE that was also overheard by me.  During the call, the CI told CHASE he would be there in about five minutes.  Thereafter, the CI departed from a neutral location in the CI's vehicle while being followed by TFO Plummer and me.  At approximately 1:47 p.m., SA Sharp observed the CI arrive in the area of SUBJECT PREMISES 1 and walk toward the apartment complex where the CI was then unobserved.  At approximately 1:49 p.m., SA Sharp observed the CI walking away from the area of SUBJECT PREMISES 1.  The CI drove away while being followed by TFO Plummer and me.

ff.  At approximately 1:56 p.m., TFO Plummer and I met with the CI at a neutral location.  The CI provided me with plastic bag containing suspected crack cocaine.  The CI told me he/she returned to SUBJECT PREMISES 1, walked inside, and was directed to kitchen.  While in the kitchen, CHASE weighed several bags of crack cocaine and then provided them to the CI in exchange for $800.  The CI then departed from SUBJECT PREMISES 1.

gg.  Following the events described above on February 18, 2011, I weighed the suspected crack cocaine obtained by the CI from CHASE that day.  The suspected crack cocaine weighed approximately 54 grams including the plastic bag packaging.  I

32

also reviewed the recorded transactions which corroborated the information the CI provided me in the debrief.

### Distribution of Crack Cocaine to the CI by BELL

23.   Based on my personal investigation in this case, including my conversations with other law enforcement officials involved in the investigation, debriefing the CI, review of electronic surveillance, and reading law enforcement reports, I learned the following:

### Attempted February 8, 2011, Crack Cocaine Purchase from BELL

a.   On February 8, 2011, the CI met with TFO Plummer and me.  During the meeting, at approximately 11:50 a.m., I directed the CI to call BELL on BELL's phone number to attempt to negotiate a one ounce purchase of crack cocaine.[6]  During the recorded call, which was overheard on speaker phone by TFO Plummer and me, the CI asked BELL, "I need a price, a ticket on a zip (one ounce)?"  BELL asked, "of what?"  The CI responded, "the wezack" (which based on my training and experience is street vernacular for crack cocaine).  BELL said, "yeah yeah yeah, you

---

[6]    Unless otherwise noted, calls made to BELL were made to BELL's phone number.  As described above, the CI previously knew BELL before the investigation and had his telephone number.  The CI also knew where BELL resided, that is, SUBJECT PREMISES 2, based on prior contacts with BELL.  In addition, on March 18, 2011, I sent an administrative subpoena to Total Call Prepaid, the company that maintains subscriber information for (909) 561-9939 according to Sprint/Nextel who maintains the toll records for (909) 561-9939.  As of the date of this affidavit, I have not received the subscriber information for (909) 561-9939.

know where I be at, hollar at me over here, I don't want to talk on the phone." The CI told BELL that the CI would be there in about 20 minutes.

   b.  At approximately 12:00 p.m., TFO Granado established surveillance on the vicinity of SUBJECT PREMISES 2 in an undercover vehicle. However, minutes later, BELL and an unidentified female exited from SUBJECT PREMISES 2, entered the blue Pontiac and departed northbound on N. Wall Avenue. As the Blue Pontiac passed TFO Granado's vehicle, the blue Pontiac stopped, backed up directly next to TFO Granado's vehicle, peered inside TFO Granado's vehicle, and then departed northbound on N. Wall Avenue.

   c.  I directed the CI to make a call to BELL to determine the status of the pending narcotics transaction. During the recorded call, which was overheard on speaker phone by TFO Plummer and me, the CI asked if BELL was ready. BELL responded that there were police in the area and that they could not do the deal.

   February 12, 2011-The CI's Conversation With BELL

   d.  On February 14, 2011, the CI told me he had an unrecorded and unmonitored meeting with BELL on February 12, 2011. The CI explained that on February 12, 2011, the CI visited BELL at SUBJECT PREMISES 2 because the CI had not had any contact with BELL since the attempted crack cocaine purchase on February

34

8, 2011, and the CI was concerned that BELL might believe that the CI was working with the police because of what happened. During their meeting at SUBJECT PREMISES 2, BELL told the CI that he though the CI had been trying to "set him up" because there were undercover police cars on BELL's street shortly after the CI called him on February 8, 2011.  The CI told BELL he had not set him up and that the CI had been buying crack cocaine from "Fatty," that is, CHASE.  The CI also told BELL he had begun buying crack cocaine from CHASE but was not happy with the quality.  BELL told the CI that he would sell an ounce of crack cocaine for $750.

### March 11, 2011, Crack Cocaine Purchase from BELL

e.  On March 11, 2011, the CI met with FBI SA Chad Hoffman and me.  During the meeting, at approximately 1:33 p.m., I directed the CI to make a call to BELL to attempt to negotiate a one ounce purchase of crack cocaine.  During the recorded call, which was overheard on speaker phone by SA Hoffman and me, the CI asked, "Can I come through?"  BELL said, "Hey hey what you talking about what you talking about, what you were talking about earlier?"  The CI said, "Yes."  BELL said, "How much you got dog?"  The CI said, "You said $750 right."  BELL said, "Yeah." The CI asked, "You want me to come now or give you a couple of minutes?"  BELL said, "Yeah you can come, but I'm gonna have to call him....you want it for sure homie?"  The CI said, "Yeah."

BELL said, "Cause I don't want to have dude bring it and then it don't you know...cause I gotta call the homie." The CI said, "Ok ok, it's a for sure thing." BELL said, "Let me call the homie, I'm gonna call him back, I'm gonna call you." The CI said, "Call me right back I'll be waiting on you."

     f.  At approximately 1:45 p.m., TFO Arrieta established surveillance in the area of SUBJECT PREMISES 2. At approximately 1:53 p.m., I directed the CI to make a call to BELL to determine the status of the narcotics transaction. During the recorded call, which was overheard on speaker phone by SA Hoffman and me, BELL said, "Alright man, I'm waiting on you, you called from a private number that's why I couldn't call you back." The CI said, "Ok, I'm on my way then." BELL said, "Yeah, he's on his way...he's coming from Fontana, he should be close, so I'm gonna hook the shit up right there, so if you could please...where you coming from?" The CI said, "East Highland." BELL said, "Alright well come on right now." At approximately 1:58 p.m, the CI was provided with $1,200 and was instructed to attempt to purchase an additional half ounce of crack cocaine if the CI was able to.

     g.  At approximately 2:05 p.m., TFO Arrieta observed a Gold Cadillac Escalade with chrome rims, that is, SUBJECT VEHICLE 1, drive southbound on N. Wall Street and pull into the driveway at SUBJECT PREMISES 2 where it was then unobserved.

     h.  At approximately 2:12 p.m., the CI drove away from

a neutral location with SA Hoffman (acting in an undercover capacity) as a passenger while being followed by me.   At approximately 2:21 p.m., TFO Arrieta observed the CI arrive at SUBJECT PREMISES 2 with SA Hoffman was the passenger of the CI's vehicle.   The CI exited the vehicle walked to the gated area of SUBJECT PREMISES 2, and after approximately two minutes walked to the driveway area where the CI was unobserved.   SA Hoffman remained in the CI's vehicle.

  i.   At approximately 2:24 p.m., TFO Arrieta observed SUBJECT VEHICLE 1 back out of the driveway of SUBJECT PREMISES 2 and drive away.   SUBJECT VEHICLE 1 pulled to the curb directly in front of TFO Arrieta as a San Bernardino Police unit drove eastbound on 16th Street.   At about 2:25 p.m., I clearly observed the driver of SUBJECT VEHICLE 1, a male with a crew cut haircut, later identified by me as Martin Lujan ("Lujan"), as SUBJECT VEHICLE 1 drove westbound on 16th Street followed by TFO Kelly and additional San Bernardino GIT members.[7]   At approximately 2:27 p.m., TFO Arrieta observed the CI reenter the CI's vehicle and proceed northbound on N. Wall Street followed by me.

  j.   At approximately 2:42 p.m., I met with SA Hoffman and the CI at a neutral location.   The CI provided me with plastic bag containing suspected crack cocaine.   The CI told me

---

[7] Surveillance units followed Lujan who was driving SUBJECT VEHICLE 1.   Those events are described below.

when the CI arrived in the area of SUBJECT PREMISES 2, BELL was standing outside of SUBJECT PREMISES 2 talking to a male, that is, Lujan, sitting inside SUBJECT VEHICLE 1. BELL, seeing SA Hoffman in the CI's vehicle, walked over and looked at SA Hoffman. The CI told BELL that SA Hoffman was his cousin from Mexico. When BELL returned, he told the CI to give the money to "his boy" in the garage of SUBJECT PREMISES 2. The CI then walked into the driveway and handed $760 to an unknown male (the "UM") who the CI described as a skinny male in his mid 20s wearing a white muscle shirt, red hat, and black shorts, while BELL stood at the end of the driveway looking up and down the block. The UM then walked to the driver's side of SUBJECT VEHICLE 1 and provided the money that the CI had given to the UM to the driver of SUBJECT VEHICLE 1, that is, Lujan. SUBJECT VEHICLE 1 then departed and the UM then returned to the garage. Shortly thereafter, BELL returned to the garage area and told the CI that he wasn't sure what was going on and didn't appreciate the CI bringing a "white boy" with him in the car. Furthermore, BELL told the CI that he only made the call and was only helping the CI out and that in case the CI was recording him, it was "entrapment." The CI told BELL the passenger of the CI's vehicle was his/her cousin. BELL then placed a telephone call to a

person that BELL called "Fatty."[8]   BELL asked the individual on

the phone if the CI had bought an ounce from them.   The CI only

overheard BELL's side of the conversation, but BELL then said,

"Ok ok he's straight," and hung up the phone.   BELL then directed

the UM in the white tank top to go into the backyard of SUBJECT

PREMISES 2 and retrieve crack cocaine.   Approximately a minute

later, the UM re-appeared with a plastic bag of crack cocaine and

provided it to the CI.

k.   Following the narcotics transaction on March 11,

2011, mentioned above, I obtained custody of the suspected crack

cocaine from the CI.   The suspected crack cocaine weighed

approximately 29 grams including the plastic bag packaging.   I

also reviewed the recorded transactions which corroborated the

information the CI provided me during the debrief.

<u>Traffic stop of SUBJECT VEHICLE 1 and Identification of
Lujan</u>

l.   After the narcotics transaction on March 11, 2011,

described above, TFO Kelly followed SUBJECT VEHICLE 1 to a car

---

[8]      On March 25, 2011, I reviewed telephone records for
BELL's phone number (909-561-9939), that I had received by way of
administrative subpoena.   From a review of the records, I
observed that on March 11, 2011, BELL's telephone number placed
an outgoing call to CHASE's phone number (909-994-4948) at
approximately 2:20 p.m, and the call had a duration of
approximately 47 seconds.   In addition, on March 11, 2011, at
approximately 2:24 p.m., BELL's telephone number received an
incoming call from CHASE's telephone number and the call lasted
approximately 147 seconds.   Furthermore, based on my
investigation, including information from the CI, I know that
CHASE uses the moniker of "Fatty."

wash located at 2266 N. Sierra Way, in San Bernardino. Lujan, who was wearing a white Kobe Bryant Laker jersey, exited SUBJECT VEHICLE 1 and went inside the car wash while SUBJECT VEHICLE 1 was being washed. Approximately 30 minutes later, Lujan re-entered SUBJECT VEHICLE 1 and proceeded southbound on Sierra Way. Shortly thereafter, TFO Granado requested a traffic stop on SUBJECT VEHICLE 1 by a SBPD unit to identify the driver of SUBJECT VEHICLE 1 who I believed was BELL's supplier of crack cocaine based on the circumstances described herein.

m. At approximately 3:01 p.m., a traffic stop was conducted on SUBJECT VEHICLE 1 by SBPD Officer Josh Lucas based on an observed vehicle violation. During the stop, Officer Lucas identified the driver and sole occupant of SUBJECT VEHICLE 1 as Lujan who was ticketed for California Vehicle Code violation 26708(a), tinted windows (SBPD citation number 935179). Additionally, Officer Lucas filled out a field interview card on Lujan who listed his address as 1414 N. Riverside Avenue, Apartment 110, Rialto, California. Additionally, Lujan gave a contact number of (909) 202-6252.

<u>March 14, 2011 Surveillance of SUBJECT PREMISES 3</u>

n. On March 14, 2011, at approximately 7:00 a.m., I conducted a drive by surveillance of an apartment complex located at 1414 N. Riverside Avenue, Rialto, California. During the drive through, I located SUBJECT VEHICLE 1 parked within the

40

gated parking lot within walking distance from apartment #110 and
#124. I did not conduct any further surveillance.

### March 15, 2011, Crack Cocaine Purchase from BELL

  o. On March 15, 2011, the CI met with TFO Arrieta and
me. During the meeting, I directed the CI to make a call to BELL
to attempt to negotiate a purchase of crack cocaine. At
approximately 12:56 p.m., during two recorded calls, the CI's
calls to BELL went directly to voicemail. I then directed the CI
to SUBJECT PREMISES 2 to attempt to meet with BELL to try to
purchase one ounce of crack cocaine. At approximately 1:00 p.m.,
I provided the CI with $750. At approximately 1:16 p.m., the CI
drove away from a neutral location while being followed by TFO
Arrieta and me.

  p. At approximately 1:21 p.m., SA Sharp and SA
Hoffman, who were conducting surveillance, observed the CI arrive
in the area of SUBJECT PREMISES 2. The CI sat in the CI's
vehicle for approximately two minutes before exiting the vehicle
and walking to the driveway of SUBJECT PREMISES 2 where the CI
was unobserved. At approximately 1:26 p.m., SA Sharp saw BELL
walking toward the front door of SUBJECT PREMISES 2. At about
the same time, TFO Plummer observed the CI in the driveway of
SUBJECT PREMISES 2 talking into a window on the northside of the
residence. At about 1:28 p.m., SA Sharp saw the CI walk away
from SUBJECT PREMISES 2, reenter the CI's vehicle, and drive away

41

while being followed by TFO Arrieta and me.  At approximately
1:30 p.m., the CI called me and said that the CI had received
"half" and needed to call BELL back for the other "half."

        q.   At approximately 1:40 p.m., the CI met with TFO
Arrieta and me at a neutral location.  The CI provided me with
plastic bag containing suspected crack cocaine.  The CI told me
when the CI arrived on N. Wall Avenue, BELL was standing in the
gated area of the residence.  The CI waited for BELL for a few
minutes and eventually got out the vehicle.  BELL walked into the
house and told the CI to go to the window by the garage.  BELL
opened the window from the inside and sat inside.  The CI asked
BELL for an ounce of crack cocaine, but BELL said he only had
about a half ounce for $300 to sell.  The CI told BELL he wanted
another ounce of crack cocaine in addition to the half ounce BELL
could sell the CI.  BELL told the CI he would have to call his
boy and that his (BELL's) cell phone was not working.  BELL then
walked away from the window for a minute to call the CI's phone
with a different phone located within SUBJECT PREMISES 2.  BELL
provided the CI with telephone number (909) 763-3274.  When BELL
returned, he provided the CI with a plastic bag of crack cocaine,
but got mad at the CI when the CI counted off $300 dollars out
loud.  BELL told the CI to count the money differently.  The CI
then counted out loud to 15 and handed BELL $300.  BELL told the
CI to call him back in 30 to 40 minutes for the other half ounce

of crack cocaine.

r. Following the purchase, the CI remained with me and TFO Arrieta while we waited to place a follow up call to BELL. At approximately 2:43 p.m., I directed the CI to make a call to BELL on (909) 763-3274 to determine the status of the narcotics transaction. During the recorded call, which was overheard on speaker phone by TFO Arrieta and me, the CI asked BELL if BELL was going to be able to get the crack cocaine. BELL asked if the CI wanted a full ounce or another half ounce. The CI told BELL that the CI wanted another full ounce of crack cocaine. The CI told BELL that the CI would wait for BELL's call.

s. At approximately 2:46 p.m., the CI received an incoming call from a private number. During the recorded call, that was also overheard by TFO Arrieta and me, BELL told the CI that the price was $750. The CI told BELL that the CI would go over once the CI received a call from BELL. Later, at about 3:40 p.m., the CI placed multiple recorded calls to (909)763-3274, but the calls were unanswered.

t. At approximately 4:11 p.m., I provided the CI with $750 and directed the CI to go to SUBJECT PREMISES 2 to attempt to purchase an ounce of crack cocaine from BELL. At about 4:15 p.m., the CI drove away from a neutral location while being followed by TFO Arrieta and me. At approximately 4:20 p.m., SA Sharp and SA Hoffman, who were conducting surveillance in the

43

area, observed the CI arrive and pull into the driveway at
SUBJECT PREMISES 2.  At about 4:27 p.m., SA Hoffman and SA Sharp
observed the CI walk away from SUBJECT PREMISES 2, reenter the
CI's vehicle, and drive away while being followed by TFO Arrieta
and me.

       u.   At approximately 4:43 p.m., the CI met with TFO
Arrieta and me at a neutral location.  The CI who provided me
with plastic bag containing suspected crack cocaine.  The CI also
provided me with $450.  The CI told me that when the CI arrived
at SUBJECT PREMISES 2, the CI pulled into the driveway of the
residence where BELL and three other males were standing.  BELL
came to the CI's vehicle and asked the CI if he already smoked
what BELL had sold him or if the CI was "slanging it" (meaning
selling it).  The CI told BELL that the CI and the CI's brother-
in-law were smoking it and they liked it.  BELL then told the UM
to call the guy and tell him that the CI wants an ounce.  The UM
then gave the phone to BELL.  After Bell finished talking, BELL
told the CI he only had a quarter (meaning 7 grams) for $300.
The CI told BELL he would take a quarter but thought BELL had
given the CI a half ounce of crack cocaine for $300 earlier.
BELL then walked to the backyard of SUBJECT PREMISES 2.  When
BELL returned, he dusted dirt off of a bag of suspected crack
cocaine which he provided to the CI for $300.  BELL told the CI
he didn't have an ounce right now but to call him later or just

come by.

v.   Following the narcotics transaction on March 15, 2011, mentioned above, I obtained custody of the suspected crack cocaine from the CI.  The suspected crack cocaine weighed approximately 14 grams including the plastic bag packaging.  I also reviewed the recorded transactions which corroborated the information the CI provided me during the debrief.

Phone Toll Analysis And Links To Lujan

24.   In order to confirm my belief that Lujan supplied BELL with crack cocaine on March 11, 2011, as described above, I conducted toll analysis of BELL's phone number.  On or about March 12, 2011, I sent an administrative subpoena to Sprint/ Nextel and requested toll activity on BELL's phone number for the period of March 10, 2011 to March 18, 2011.

25.   On March 19, 2011, from reviewing telephone toll records regarding BELL's phone number, I learned the following:

a.   On March 11, 2011, at approximately 1:35 p.m., (1:33 p.m. in surveillance notes), the CI placed a call to BELL's phone number which lasted approximately 96 seconds (during that call the CI requested 1 ounce of crack cocaine from BELL and BELL told the CI he had to call his boy).  At approximately 1:37 p.m., BELL's phone number placed an outgoing call to (951) 289-6331 which lasted approximately 61 seconds.  There were no calls between the CI's call to BELL's phone number and the next call on

45

BELL's phone number.  At approximately 1:55 p.m., the CI placed a call to BELL's phone number (during the call BELL told the CI that "he's on his way").  Shortly thereafter, at approximately 2:00 p.m., BELL's phone number received an incoming call from (951) 289-6331 which lasted approximately 44 seconds. Thereafter, law enforcement surveillance observed the SUBJECT VEHICLE 1 arrive at SUBJECT PREMISES 2 at approximately 2:05 p.m.

26.   On March 19, 2011, after reviewing the March 11, 2011 tolls on BELL's phone number, I called (951) 289-6331 and the call went to voicemail.  The voicemail message for (951)289-6331 stated, "You can reach me at (909) 262-6252."  (909) 262-6252 is the phone number Lujan provided Officer Josh Lucas on March 11, 2011, during a traffic stop (paragraph 23(m) above).  Later at about  5:47 p.m., I placed a recorded call to (951)289-6331.  On three occasions, a male voice answered and I hung up, however, I recorded the outgoing voicemail message described above on the fourth attempt.

27.   Based on my training and experience and the information from my investigation described in this affidavit, I believe Lujan, who arrived at SUBJECT PREMISES 2 on March 11, 2011, was the supplier of crack cocaine to BELL.  Based on the pattern of phone calls, Lujan's arrival time, observation of the surveillance video where the CI handed $760 to the UM and the UM immediately walked to SUBJECT VEHICLE 1, and SUBJECT VEHICLE 1's

46

immediate departure thereafter, I believe LUJAN was the
individual BELL called on (951)289-6331 to request a supply of
crack cocaine.   Furthermore, the voicemail message for
(951)289-6331 directs callers to phone number (909)262-6252,
which is the number Lujan provided to SBPD Officer Lucas during
the traffic stop on March 11, 2011.

Summary of Laboratory Analysis Results

28.   Based upon my review of materials related to this
investigation, I know that the suspected crack cocaine that was
purchased during the investigation described herein was submitted
to DEA Southwest Laboratory for analysis.   Based upon my review
of the DEA laboratory reports on or about March 25, 2011, I
learned the following:

a.   The suspected crack cocaine obtained on February
8, 2011, was tested by DEA Senior Forensic Chemist Daniel M.
Roesch, who determined the substance had an active drug
ingredient of cocaine base, had a net weight of approximately
20.5 grams, a purity of approximately 51.4%.

b.   The suspected crack cocaine obtained on February
11, 2011, was tested by DEA Senior Forensic Chemist Daniel M.
Roesch, who determined the substance had an active drug
ingredient of cocaine base, had a net weight of approximately
39.5 grams, a purity of approximately 47.3%.

c.   The suspected crack cocaine obtained on February

47